KATE M. KEELER *et al.* Plaintiffs in Error, *vs.* THE MERCHANTS LOAN AND TRUST COMPANY, Exr. *et al.* Defendants in Error.

*Opinion filed February 23, 1912—Rehearing denied April 3, 1912.*

1. WILLS—*rules governing the incorporation of instruments into wills.* To permit the incorporation of another instrument into a will by reference, the will itself must refer to the other instrument as being in existence at the time of the execution of the will and in such a way as to reasonably identify the instrument and show the testator's intention to make it a part of the will; and the instrument must, in fact, be in existence when the will is executed, and must correspond with the description thereof in the will and be shown to be the instrument referred to.

2. SAME—*all requisites must co-exist to authorize incorporation of an instrument into a will by reference.* To authorize the incorporation of an instrument into a will by reference all the elements requisite to such incorporation must co-exist, and the absence of any one of them will prevent the incorporation.

3. SAME—*will must refer to instrument to be incorporated as being in existence.* The instrument to be incorporated into a will must be referred to in the will as being in existence at the time of the execution of the will, and in the absence of a reference to that effect in the will parol evidence is not admissible to show that the instrument was, in fact, in existence when the will was made.

4. SAME—*reference to an instrument "to be" prepared does not incorporate it in the will.* A reference in the will to an instrument "to be" prepared or made prevents such instrument from being incorporated into the will, as there is, in such case, no reference in the will itself to the instrument as being in existence when the will was made.

5. SAME—*what words do not, of themselves, definitely refer to notes as being in existence.* The words, "the principal of any note signed by me," or "any note or notes signed by me," do not, standing alone, refer definitely to the notes as being then in existence but would refer as well to notes to be afterwards signed.

6. SAME—*when entire paragraph of a will sufficiently refers to notes as being in existence.* A paragraph in a will reading, "It is my further will and direction that any note or notes signed by me in favor of any person or persons and made payable by the terms thereof after my decease, be recognized and treated as bequests in behalf of the payees therein, respectively, designated. * * * I

have heretofore, and may hereafter, adopt this means of designating the persons I wish to be remembered as beneficiaries under my last will and testament," sufficiently refers to notes as being then in existence, notwithstanding the intimation that the testator might make other notes after executing the will.

7. Under the above paragraph, notes in existence at the time the will was made and not subsequently destroyed by the testator are sufficiently referred to to permit of their identification, and entitle them to be given effect as testamentary bequests even though no effect could be given to notes made after the will was executed; and as to the notes in existence when the will was executed, the paragraph should be construed as though it did not contain the intimation that the testator might afterwards make other notes to designate beneficiaries.

8. The court reviews the evidence in this case at length, and holds that it sufficiently establishes that there were notes signed by the testator, and payable after his death, in existence at the time the will' was executed, but that it does not show that they were in existence at the time of the testator's death or that they were destroyed by other persons after his death.

WRIT OF ERROR to the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. JULIAN W. MACK, Judge, presiding.

Patrick J. Sexton died October 28, 1903. He left a last will and testament, which was executed July 26, 1902. It was admitted to probate December 1, 1903. Defendant in error the Merchants Loan and Trust Company was named in the will as executor, and upon the probate of the will letters testamentary were issued to it. Sexton left surviving him his widow, Anna L. Sexton, and two sons, Thomas O'D. Sexton and Patrick J. Sexton. Thomas was about twenty-one years old and Patrick J. about nine years at the time of their father's death. One brother, John M. L. Sexton, and three sisters, Mary McAnrow, Kate M. Keeler and Eliza Reilly, survived him, but the latter died shortly after her brother's death and Helen McKeon was appointed her administratrix. Katie McAnrow, Susie Mc-

2 5 3 — 3 4

Anrow, Lucinda Reilly and Eliza B. Reilly were daughters of the sisters Mrs. McAnrow and Mrs. Reilly, and John J. Reilly and Thomas Reilly were sons of Mrs. Reilly. These nephews and nieces survived their uncle, Patrick J. Sexton. The testator left an estate valued at something over one million dollars. His last will was prepared by John N. Jewett, who is now dead. The will is a lengthy. document, and as only parts of it are involved in this litigation we shall not set it out in full.

In addition to provisions made in the will for the widow and sons of the testator, by the third paragraph he gave to his brother, John M. L. Sexton, all indebtedness the brother owed him, and directed the cancellation and surrender of all evidences thereof by his executor and released and discharged the brother from all liability by reason of such indebtedness. In addition thereto he directed the payment by his executor to his brother, "as a further legacy and bequest, the full principal amount of any note or notes executed by me in his favor and which he may hold, or which may be held by any other person or persons for his account and benefit at the time of my decease, and which by the terms thereof are made payable after my death." By the fourth paragraph similar provision for the release of all indebtedness to him and the payment of any note held by her or anyone for her account and benefit and signed by the testator and payable after his death was made for his sister Mrs. Reilly, in addition to other bequests in her favor. By the fifth and sixth paragraphs he released his sisters Mrs. McAnrow and Mrs. Keeler from any liability to him on account of any indebtedness they might owe him, and in addition to other bequests directed that the principal sum of any note signed by him and payable after his decease to them, respectively, be paid out of his estate. The ninth and thirteenth paragraphs of the will read as follows:

"*Article ninth*—It is my further will and direction that any note or notes signed by me in favor of any person or

persons and made payable by the terms thereof after my decease, be recognized and treated as bequests in behalf of the payees therein, respectively, designated, and my executor and trustee is hereby fully authorized and empowered to pay the amount of the principal of such notes out of my estate and property or the proceeds thereof. I have heretofore, and may hereafter, adopt this means of designating the persons I wish to be remembered as beneficiaries under my last will and testament.

"*Article thirteenth*—In respect to the notes hereinbefore referred to as notes signed by me and by the terms thereof made. payable after my decease, it is my further will and direction that they be presented and filed in the usual way as claims against my estate in the proper court having jurisdiction of the settlement of my estate and within the time allowed by law for such settlement, and that when so presented and filed and in the due course of the business of said court they be allowed as just claims against my estate before payment thereof by my executor and trustee, and my executor and trustee is hereby instructed and directed to make no objection to the allowance thereof."

After the death of Patrick J. Sexton no notes payable to any person after his death were found among his papers or effects. On November 30, 1904, which was the last day for filing claims against the estate of Patrick J. Sexton in the probate court, the two sisters, Mrs. Keeler and Mrs. McAnrow, the administratrix of the estate of Mrs. Reilly, the deceased sister, and the four nieces and two nephews above named, presented claims, respectively, based on the contention that Patrick J. Sexton had designated each of the three sisters as beneficiaries to the extent of $20,000 by notes executed in their favor, respectively, payable after his death; that in the same manner he had designated each of the four nieces as beneficiaries to the extent of $10,000 and each of the two nephews to the extent of $5000. These claims were all disallowed by the probate court and appeals

were prosecuted to the circuit court.  Upon a hearing in that court they were allowed, and from the judgment of the circuit court the executor and widow prosecuted an appeal to the Appellate Court for the First District.  That court reversed the judgment of the circuit court and remanded the cause, with directions to the circuit court to dismiss the proceedings.  Upon the petition of the claimants the cases are brought to this court upon a writ of *certiorari.*

As the record, abstracts and briefs are the same in each case, they have been in this court, as they were in the Appellate Court, consolidated and but one opinion will be prepared and filed.

GEO. W. PLUMMER, WHARTON PLUMMER, and SEARS, MEAGHER & WHITNEY, (NATHANIEL C. SEARS, and JESSE J. RICKS, of counsel,) for plaintiffs in error:

Extrinsic evidence was admissible to prove the amounts specified in the notes and the persons to whom such amounts were payable.  Underhill on Wills, (1900 ed.) sec. 286; 1 Jarman on Wills, (6th ed.) \*99; 1 Redfield on Wills, (4th ed.) \*261, 262; Schouler on Wills, (3d ed.) secs. 281, 282; Remsen on Wills, 306, 307; Page on Wills, (1901 ed.) secs. 162, 163; *Newton* v. *Seaman's Friend Society,* 130 Mass. 91; *Singleton* v. *Tomlinson,* L. R. 3 App. Cas. 404; *In the Goods of Smart,* L. R. P. & D. (1902) 238; *University College* v. *Taylor,* L. R. P. & D. (1908) 140; *In re Yockey,* 29 L. T. 699; *Thayer* v. *Wellington,* 91 Mass. 283; *Bryan's Appeal,* 77 Conn. 240; *Dyer* v. *Erving,* 2 Dem. 160; *Rose* v. *Cunynghame,* 12 Ves. Jr. 28; *In the Goods of Watkins,* L. R. 1 P. & D. 18; *Hartwell* v. *Martin,* 71 N. J. Eq. 157; *Heidenheimer* v. *Bauman,* 84 Tex. 174; *Hunt* v. *Evans,* 134 Ill. 496; *Shaw* v. *Camp,* 163 id. 144; *Habergham* v. *Vincent,* 2 Ves. Jr. 204; *Hatheway* v. *Smith,* 65 Atl. Rep. 1058; Wigram on Evidence, 188; *In re Rowe,* 1 L. R. Ch. D. (1898) 153.

The evidence was sufficient to establish the claims.  *Gorham* v. *Dodge*, 122 Ill. 528; *Sanford* v. *Raikes*, 1 Mer. 646; *Evans* v. *George*, 80 Ill. 51; *Kavanagh* v. *Wilson*, 70 N. Y. 177; *In re Immel's Estate*, 59 Wis. 249; *Podmore* v. *Whatton*, 3 Sw. & Tr. 449; *Jones* v. *Murphy*, 8 W. & S. 275; *In the matter of Page*, 118 Ill. 576; *Finch* v. *Finch*, 1 L. R. P. & D. 371.

McCULLOCH & McCULLOCH, and HOYNE, O'CONNOR & IRWIN, for defendants in error:

The alleged notes never having been proved or offered for probate in the probate court as a part of the will can not operate as a testamentary disposition of property.  Rev. Stat. chap. 148, sec. 2; *Beatty* v. *Clegg*, 214 Ill. 34.

The probate of a will is necessary in Illinois and cannot be dispensed with even by the testator's direction.  *Harris* v. *Douglas*, 64 Ill. 466; *Hicks* v. *Deemer*, 187 id. 164; *Beatty* v. *Clegg*, 214 id. 34.

A testamentary gift cannot be made in the form of an unattested promissory note of the testator.  *Williams* v. *Forbes*, 114 Ill. 167; *Richardson* v. *Richardson*, 148 id. 563; *Kirkpatrick* v. *Taylor*, 43 id. 207; *Blanchard* v. *Williamson*, 70 id. 647; *Pratt* v. *Trustees*, 93 id. 475; *Shaw* v. *Camp*, 160 id. 425; *Grove* v. *Jeager*, 60 id. 249.

The extrinsic papers,—the alleged notes,—not having been established to be a part of the will by direct proceedings therefor in the probate court, they cannot be used to evidence bequests.

A will must be wholly in writing.  It cannot rest partly upon a writing and partly in parol.  It must be witnessed in accordance with the statute.  Rev. Stat. chap. 148, sec. 2; *Graves* v. *Rose*, 246 Ill. 76; *Oswald* v. *Caldwell*, 224 id. 224; *Benner* v. *Bailey*, 234 id. 79; *Vestal* v. *Garrett*, 197 id. 398.

The law does not permit a will to be supplemented or a blank to be filled by parol testimony.  *Engelthaler* v. *Engel-*

*thaler,* 196 Ill. 230; *Hunt* v. *Hort,* 3 Brown's Ch. 258; *Taylor* v. *Richardson,* 2 Drewry, 16; *Baylis* v. *Attorney General,* 2 Atk. 239; *Martin* v. *Ballou,* 13 Barb. 119; *Davis* v. *Davis,* 8 Mo. 47.

To incorporate an unattested paper into a will it must not only be in existence when the will is made but must be referred to by the will as being already in existence, and must be referred to in such terms that no document made in the future will answer the description, and the will itself must identify the extrinsic document. 1 Jarman on Wills, \*99; Page on Wills, sec. 162; 1 Underhill on Wills, sec. 280; Bigelow on Wills, 61, 62; Remsen on Wills, 307; Rood on Wills, sec. 250; Gardner on Wills, 44, 46; Chaplin on Wills, 426; Walkem on Wills, 240; Lovelass on Wills, \*304; *University College* v. *Taylor,* L. R. P. D. (1908) 140; *In re Sunderland,* L. R. 1 P. & D. (1866) 198; *In re Bryan's Appeal,* 77 Conn. 240; *In re Watkins,* L. R. 1 P. & D. (1865) 19; *In re Yockey,* 29 L. T. 699; *Hartwell* v. *Martin,* 71 N. J. Eq. 157; *In re Truro,* L. R. 1 P. & D. (1866) 201; *In re Reid,* 38 L. J. P. D. & M. (1868) 1; *Heidenheimer* v. *Bauman,* 84 Tex. 174.

Where the language referring to extrinsic documents is broad enough to apply to a document to be written afterwards, it is not a sufficient reference to any document as then existing. *University College* v. *Taylor,* L. R. P. & D. (1908) 140; *In re Reid,* 38 L. J. P. D. & M. (1868) 1; *In re Truro,* L. R. 1 P. & D. (1866) 201.

A reference in the will to the instrument incorporated as "made or to be made" does not refer to it clearly as being in existence. Page on Wills, sec. 163; 1 Jarman on Wills, \*99; 1 Underhill on Wills, 381, 382; Redfield on Wills, \*262, 263; Walkem on Wills, 241.

The law does not permit a testator, by any form or process, to retain the power to change his testamentary gifts,—that is, to keep his will ambulatory,—without complying with the statutory requirements as to writing, signing and

witnessing at a time when witnesses testify that he was of sound and disposing mind and memory. Bigelow on Wills, 61, 62; *Thayer* v. *Wellington,* 91 Mass. 283; *In re Yockey,* 29 L. T. 699; *Hartwell* v. *Martin,* 71 N. J. Eq. 157; *Habergham* v. *Vincent,* 2 Ves. Jr. 204; *Thompson* v. *Quimby,* 2 Bradf. 449; *Dyer* v. *Erving,* 2 Dem. 160; *Rose* v. *Cunynghame,* 12 Ves. Jr. 28; *Chase* v. *Stockett,* 72 Md. 235; *Johnson* v. *Ball,* 5 DeG. & Sm. 85; *In re Smart,* L. R. P. & D. (1902) 238; *In re Kehoe,* 13 L. R. Ir. Ch. Div. 13; *Phelps* v. *Robbins,* 40 Conn. 250.

Mr. JUSTICE FARMER delivered the opinion of the court:

The rules authorizing extrinsic writings to be incorporated by reference to them by the testator in his will, so as to entitle them to be given testamentary effect, will be found stated in all text books on the subject of wills and in many judicial decisions. There is no conflict in the authorities and there can be no misunderstanding as to the rules of law on this subject, but their application to the will in this case is controverted. Three cardinal rules govern the incorporation of an extrinsic writing in a will by reference so as to give the writing testamentary effect. They are sufficiently stated in the following quotations to get a clear understanding of them and no other authorities need be referred to for that purpose:

"From the proposition that a will may be written upon different pieces of paper, connected only by the sense, it follows that a will may by reference incorporate into itself, as completely as if copied in full, some other paper which in itself is not a will for lack of execution. In order so to incorporate, three things are necessary: (1) The will itself must refer to such paper to be incorporated (*a*) as being in existence at the time of the execution of the will, and (*b*) in such a way as to reasonably identify such paper in the will, and (*c*) in such a way as to show testator's intention to incorporate such instrument in his will and to make it a

part thereof. · Thus, a paper placed with a will is not a part thereof where the will shows no intention to incorporate it. (2) Such document must, in fact, be in existence at the time of the execution of the will. If this were not the rule, testator could, by executing a will and incorporating therein a document to be executed in the future,· create for himself a power to dispose of his property in a testamentary manner by an instrument not executed in accordance with the Statute of Wills. (3) Such instrument must correspond to the description thereof in the will and must be shown to be the instrument therein referred to. In discussing incorporation by reference it must first be observed that these three requisites must co-exist in order to incorporate a foreign paper into the will. The absence of any one of them will prevent such incorporation. The will must refer to the instrument to be incorporated as in existence. A reference in the will to the instrument incorporated as 'made or to be made' does not refer to it clearly as being in existence, nor does a reference to it as a schedule of property 'hereafter named.' Since the document to be incorporated must be referred to in the will as in existence at the date of executing such will, it follows that in the absence of such reference parol evidence is not admissible to show that the document was in existence at the time of executing the will." (Page on Wills,—1901,—secs. 162, 163.)

"In order that a writing extrinsic to the will may be validly incorporated by the reference of the testator to it in the will, three facts must be shown. In the first place, the testator in the will itself must refer to the writing as being in existence at the date of execution; secondly, it must be proved (and this, of course, can only be done by parol evidence,) that the writing was, in fact, in existence at the date of the will; third, the writing which is offered for probate as a part of the will must be identified by the proponent as the writing which was referred to by the testator." (1 Underwood on Wills, sec. 280.)

"The reference must indicate that the writing has already been made,—that is, must speak of it as then existing. It is not enough that the writing was, in fact, made before the will. The will must speak of it as if then made." (Rood on Wills, sec. 250.)

"As to a paper not actually in existence but hereafter to be prepared and executed, no reference in the existing will can give it any valid testamentary effect, independently of its own proper execution as a will in conformity with the statute, hence the testator cannot reserve a power to dispose of property at a future time by what is tantamount to a will informally executed, nor to select a legatee under some subsequent writing. Indeed, the written reference in the will to a paper as something to be afterwards prepared sufficiently debars that paper from being legally incorporated with it, for parol evidence of the time of preparation is held inadmissible to contradict such reference." (Schouler on Wills,—3d ed.—sec. 281.)

Whether any notes are so referred to in the will of Patrick J. Sexton as to bring them within the rules and authorize giving effect to them as bequests, if any such instruments were found among the testator's papers and effects or their unauthorized destruction was proven, depends upon the meaning of the language used in the ninth paragraph of the will.

Patrick J. Sexton made two wills prior to making the one here under consideration. One was made in 1888 and one in June, 1893. The proof as to the existence of the notes upon which the claims of plaintiffs in error are based when the last will was made, in 1902, will be more fully referred to hereafter, but in order to a clear understanding of the discussion to follow, it is proper to state that plaintiffs in error claimed, and their proof tended to show, that designating certain beneficiaries by notes payable after Sexton's death was a part of the scheme of each of the wills he executed, and that he made notes for that purpose on

each occasion when he executed the wills of 1888 and 1893. Plaintiffs in error contend that the notes designating them as beneficiaries were made before and were in existence when the will of 1893 was made, in which language similar to that of the last will was used, and that those notes were never destroyed by the testator but were in existence when the last will was executed and were the notes referred to by the testator in that will.

The language used in the third, fourth, fifth and sixth paragraphs is not a reference to a note or notes then in existence. The direction of said paragraphs that "the principal of any note signed by me" in favor of the persons mentioned in said paragraphs might as well refer to a note afterwards to be executed as to one then in existence, and therefore fails to meet one of the essential tests,—that the writing must be referred to in the will as then in existence. The first sentence in the ninth paragraph is a general direction that "any note or notes" signed by the testator payable after his death "to any person or persons" be treated as bequests in behalf of the payees designated, the principal of such notes to be paid out of the testator's estate. This language, standing alone, would also fail to meet the requirement that the note or notes must be referred to in the will as being then in existence. In the next sentence, which is the only other sentence in the ninth paragraph of the will, the testator says: "I have heretofore, and may hereafter, adopt this means of designating the persons I wish to be remembered as beneficiaries under my last will and testament." Whether, if there were notes of the kind described in existence, they were so referred to as to bring them within the rule mentioned, depends upon the meaning and construction to be given this last sentence of the ninth paragraph.

The first sentence of the paragraph, as we have stated, expresses the will of the testator that notes made payable to persons after his decease and signed by him should be

treated as bequests in favor of the payees. This is immediately followed by the statement of the testator that he had "heretofore" adopted this means of designating persons he wished to remember as beneficiaries under his will. "Heretofore," according to the definition of lexicographers, means "in time past," "previous time," "previously." It is plain from the language itself and the connection in which it is used that the reference was to notes made for the purpose of designating beneficiaries, and was not, as contended by defendants in error, to a will or wills theretofore made for the purpose of designating beneficiaries. It seems entirely clear that if no other language had been used except the statement that the testator had previously adopted, as a means of designating persons he wished to remember as beneficiaries, the making of notes payable to them after his decease, it could be given no other meaning than that he had made notes for that purpose before executing his will. Does the expressed possibility of his designating beneficiaries by making notes after the execution of the will invalidate bequests to persons so designated by notes made before the will was executed? We think not. There is nothing in the language of the will to indicate that it did not, at the time it was executed, fully express the testator's then wishes and purposes with reference to the distribution of his property at his death. There is nothing to indicate that he regarded it as incomplete, or that it was, in fact, incomplete at that time. No effect could be given to notes made after the will was executed, but the expression of the possibility of the testator subsequently adopting that means of designating beneficiaries cannot reasonably be construed to mean that the will was incomplete as to beneficiaries already designated in that manner, or that the purpose of notes to be afterwards made was for the completion of the will.

If the testator had designated beneficiaries in 1893 by making notes payable to them after his decease, there is no

evidence that he ever made any other notes for that purpose. The will contains a definite statement that the testator had previously designated beneficiaries by notes payable to them after his death. That is a reference to writings then in existence and to that extent complies with the law. The testator had been erroneously advised that he could afterwards designate beneficiaries in the same way, and he stated in his will that he might do so. There is, however, no intimation of an intention that the right of the beneficiaries designated before the will was executed, to share in the distribution of his estate to the extent of the principal of the notes, should in any way be dependent upon what he might afterwards do. The will should be construed, as to any notes made before it was executed, the same as if it did not contain the statement that the testator might afterwards make notes to designate beneficiaries. If notes previously made were properly referred to so as to make them valid bequests, the statement that the testator might subsequently designate beneficiaries by notes that would be invalid could not affect those that were valid. We are of opinion the will did refer to notes as then in existence, and if they were, in fact, in existence at the time of the execution of the will and were not subsequently destroyed by the testator, they were sufficiently described so as to be identified and entitle them to be given effect as testamentary bequests.

No notes designating plaintiffs in error as beneficiaries were found after the death of Patrick J. Sexton. Plaintiffs in error sought to prove that the notes were in existence when the last will was made; that they were never destroyed by the testator but were destroyed by the widow, or by her and someone acting with her and under her direction, after or about the time of the death of the testator. If, as we hold, the will referred to the notes as in existence at the time of its execution, parol proof was competent to show that they were, in fact, in existence at that time. This

is supported by the text books and decisions, and we do not understand it is disputed.

Upon the question as to the existence of the notes when the last will was executed, the proof for plaintiffs in error was as follows:

A. S. Bradley, a lawyer, testified he was attorney for Patrick J. Sexton for several years and drew the will executed by him in 1888 and the one executed in June, 1893; that when the will of 1888 was executed Sexton inquired of the witness about designating beneficiaries by notes and incorporating them in the will by reference; that the witness remembered seeing at the time four notes,—one payable to the brother and one to each of the three sisters,—for $10,000 or $15,000 each. The witness advised against that method of designating beneficiaries but Sexton insisted on doing it that way, and gave as one reason that he did not want to put in the will the amount of money he desired to give his brother and sisters, because he thought his affairs might prosper and he might make additional notes. The witness said he advised him that "if you want to make some more notes and put in there, all you have to do is to go to John and get the key of the safety deposit vault and unseal your package and put in your notes and seal it up again; that is all you have to do." The will executed in June, 1893, was prepared by the witness, and he testified it contained substantially the same language with reference to his brother and sisters and designating beneficiaries by notes payable after his death as is contained in the will under consideration. The witness testified that at the time the will was executed the testator had, and exhibited to him, four notes for $20,000 each, one payable to the testator's brother and one to each of his sisters; also four notes for $10,000 each, payable to the four nieces, daughters of his sisters Mrs. Reilly and Mrs. McAnrow, and two notes each for $5000 or more,—the witness could not remember the exact amount,—payable to two nephews, sons of tes-

tator's sister Mrs. Reilly. The witness stated that the testator had twelve notes, and included notes payable to the sons of Mrs. McAnrow, but neither they nor the brother of the testator are seeking to enforce any claim by reason thereof. The witness stated Sexton asked him what date he should give the notes, and he replied to just write in the date line "June," which Sexton did. The notes were payable in Chicago after testator's decease. After the will was executed Sexton put the notes, with the will, in an envelope, put the package in his pocket and went away. The witness did not afterwards see the notes.

Joseph B. Langworthy, a lawyer, testified he had represented Patrick J. Sexton in some business matters, and that in the latter part of June or early in July, 1903, just prior to Sexton starting on a trip to Europe for the benefit of his health, he talked with the witness about his will. The witness stated it was the day the testimony was closed in *Merchants Loan and Trust Co.* v. *Egan*, 222 Ill. 494, in which Sexton was interested. The witness testified that during the hearing of evidence that afternoon, Judge Moran, one of counsel in the case, had made some statement about the necessity of the delivery of documents or papers in order to complete a bequest or gift; that Sexton referred to this statement of Judge Moran and said it was different from what he had been advised by Jewett; that Jewett had told him he could evidence bequests by a note, provided he mentioned the note in the will and directed its payment; that he had acted upon that advice and made a will in that way; that Bradley, who was his attorney for a number of years, knew about it, had seen the notes and seen to it that they were drawn in accordance with the will; that he said the bequests made that way were for some members of his family, and he designated them by making notes because he desired to put them on a different footing from other legatees.

Judge Kavanagh testified he had been intimately acquainted with Sexton and his family several years and at one time was his attorney; that after Sexton's return from Europe, in 1903, (he returned in the early part of September of that year,) he had two conversations with him. The first one he did not remember distinctly, but testified Sexton told him about his will and some notes he had executed, which were, in effect, to be legacies to his relatives. The second conversation he stated was about ten days before Sexton's death. Judge Kavanagh testified that Sexton told him he had provided for his relatives by making promissory notes for the amounts he wished them to have, and the judge inquired if he had delivered the notes to the payees. Sexton replied that he had not and that they were then in his possession. He said Jewett thought they were perfectly valid and that he made them under the direction of Bradley. Sexton was very ill, and not wishing to bother him the judge said he replied that Jewett was one of the best lawyers in the city; that Bradley was a very good lawyer, and if they had so advised him he could depend upon it as being the law, but added that he would look it up, and advised Sexton to remain easy in his mind and not bother about it.

James F. Crahen, a lawyer, testified he was in the office of John N. Jewett at the time the last will was executed; that he wrote the will under the direction of Jewett and was one of the witnesses to it; that he heard none of the talk between Jewett and Sexton prior to the preparation of the will, but while it was being written by him, under Jewett's direction, something was said either by Sexton or by Jewett (he thought the latter) about notes, but the witness saw no notes.

None of the above testimony was contradicted, but we have set it out, in substance, rather fully, because it is earnestly argued by defendants in error that it was insufficient to establish the fact that the notes were made and

in existence when the will was executed. It is true, as stated by counsel, that Bradley, at the time he testified, was seventy years of age and was testifying as to matters that occurred several years before, but there is nothing in the record to impeach either his memory or veracity and nothing we can see that would justify refusing to give his testimony credence. We think the testimony must be held sufficient to establish the existence of the notes when the will of 1893 was executed. The testimony of Langworthy and Judge Kavanagh indicates that it was those notes which were referred to by the testator in his conversations with them, and if those notes were in existence when the last will was made and were not afterwards destroyed by the testator, they were sufficiently referred to in the will to entitle them to be given testamentary effect. The notes were not found after the death of Sexton, and it remains to be determined whether plaintiffs in error proved they were not destroyed by him but were destroyed by his widow, or by the widow and someone in connection with her and acting under her direction. The testimony bearing upon this question is voluminous and we shall not undertake to refer to it in detail. A careful consideration of the evidence convinces us that it was insufficient to warrant the conclusion that the notes were destroyed by Mrs. Sexton, or by her and others acting with her or under her direction, about the time or after the death of Sexton.

The notes were never seen by anyone after the execution of the will in 1893, when Bradley said they were placed in a package, with the will, by Sexton and taken away by him. If they were in existence when the will of 1902 was executed they were not exhibited to Crahen, who wrote the will at the direction of Jewett. The proof does not show where the notes Bradley testified about were kept by Sexton after Bradley saw them, in 1893. Sexton had a safety deposit box in a vault of the National Safe Deposit Company at the time of his death. He had had a box in

the vaults of the said company since 1891, but it is not shown by the evidence that either his will or the notes were ever kept there. In August, 1903, he was ill, and went to Europe in the hope of improving or restoring his health. Before departing he delivered to Father Smyth, a Catholic priest, a sealed package about as big as a large envelope and from one and one-quarter to one and three-quarters of an inch thick. The outside wrapper was brown paper and it was sealed with black sealing wax. Father Smyth testified that when Sexton handed him the package he said: "Take this; this is yours; I will write you instructions from the other side." On the outside of the package was written: "This belongs to the Reverend Hugh P. Smyth, who knows my will, and this is to be opened at my death but not before my death." This was followed by the signature of Patrick J. Sexton. He did not write Father Smyth any instructions. He was very ill upon his arrival in London and remained ill until his return, in September, 1903. Upon his return home Father Smyth delivered the package back to him without ever having opened it or learned anything of its contents. This package and a carbon copy of his last will were kept in a satchel in testator's bed-room, where he was confined until his death after his return from Europe. The satchel was kept by the side of or under his bed, and Mrs. Sexton testified he frequently took papers out of it, especially the carbon copy of the will, which he often read and examined. Samuel T. Jacobs was the secretary of Sexton at the time of his death and had occupied that position since the beginning of 1894. The day following Sexton's death this satchel was by direction of Mrs. Sexton delivered to Jacobs, who had gone to the house at her request. The satchel was opened by Jacobs, and according to the testimony the only papers in it were the sealed package and carbon copy of the will. Mrs. Sexton informed Jacobs her husband had told her, in case of his death, to deliver the satchel to him. Jacobs took the sealed package

and carbon copy of the will but left the satchel. He delivered the package and copy of the will to Father Smyth, and stated he had been so instructed by Mrs. Sexton. Father Smyth took the sealed package to the office of his attorney some time afterwards and it was there opened. It contained the will, and probably thirty or forty other papers, and some letters. Just what the papers and documents contained in the package were is not shown, except that some of the papers were deeds signed but no grantees named therein. One deed conveyed the homestead to the testator's brother, John. Father Smyth testified that under instructions of his attorney he delivered certain papers and documents to members of the testator's family, and upon being asked what he meant by members of his family, said he meant his brother, sisters and their children. Some of the papers were notes of the testator's brother and sisters, or some of them, payable to him and secured by mortgage. These Father Smyth delivered to the relatives who made them. The witness was unable to give a correct statement of all the papers and documents found in the package with the will, but says there were no notes payable to the brother, the sisters or the nephews and nieces.

Sexton died about five or six o'clock on the evening of October 28. Some time during the forenoon of that day George Lawrence, a nurse Sexton brought home with him from London and who was taking care of him, prepared an order on D. Peckham, of the National Safe Deposit Company, to allow Mrs. Sexton to open her husband's safety deposit box. Sexton's name was signed to the order by the nurse and he made his mark, which was witnessed by the nurse. Mrs. Sexton met Jacobs at the vault of the safe deposit company between two and three o'clock that afternoon. Jacobs signed the order as a witness and put his notarial seal to it, although he did not see Sexton make his mark. He testified he inquired of Mrs. Sexton and called up Lawrence and inquired of him, and was told by them

that they saw him make his mark to the order. They were admitted to the box, opened it, and both Jacobs and Mrs. Sexton testified they took therefrom three certificates of stock in the Cosmopolitan Safety Deposit Company and some jewelry of Mrs. Sexton and her deceased daughter. They testified nothing else was taken from the box. If the notes had been in the box they then had an opportunity to have secured possession of them, but there is no evidence whatever that the notes were then, or ever had been, in the box. As before stated, when last seen they were placed by Sexton in a package with his will of 1893. It would naturally be expected that the notes and the will would be kept together as long as the notes were in existence. It is certain the will had not been in the safety deposit box for some time, at least, before the testator's death. It is not at all probable that the notes were in the safety deposit box, or that they were taken therefrom on the occasion of the visit of Mrs. Sexton and Jacobs to the vault.

Counsel for plaintiffs in error say there are many reasons for believing that the notes were in the sealed package. We think the evidence entirely insufficient to justify the conclusion that they were in the safety deposit box. Mrs. Sexton and Jacobs both testified in explanation of their visit to the safety deposit box and the reason for it at the time it was made. Jacobs testified Sexton had some stock in the Cosmopolitan Safety Deposit Company, which had gone into liquidation some five years previous, and a check had been made payable to Sexton which he was asked to accept and surrender his certificates of stock. This he had declined or neglected to do, and Langworthy, the lawyer who had charge of the business, told Jacobs if they did not surrender the certificates at once they would lose the money, which was $2500. The Langworthy referred to is the same Langworthy who had testified on behalf of plaintiffs in error as to a conversation with Sexton about notes. He was not called to testify as to the correctness of Jacobs'

statement, and we take it the testimony of Jacobs upon this subject should be accepted as true. Jacobs testified he notified Mrs. Sexton of this by telephone, and asked her to get an order to open the box for the purpose of procuring the certificates and surrendering them for the $2500. Mrs. Sexton testified she asked the nurse, Lawrence, to inform her husband about what Jacobs had told her; that he did so, and in pursuance of this the order was prepared and signed in the manner stated. The certificates were taken from the box, surrendered and the money received therefor. In addition to the certificates Mrs. Sexton took from the box the jewelry before referred to. This explanation, we think, relieves Mrs. Sexton of any suspicion on account of her visit to and opening the safety deposit box.

If the notes were in the sealed package they could have been obtained by Mrs. Sexton, or by her and others acting with her, by breaking the package open. It was kept in a satchel in the room of Sexton from the time he returned from Europe till his death, and the satchel was not locked. Miss Gleason was, and had been for some years, the companion of Mrs. Sexton. The family residence of the Sextons was at 1340 Michigan avenue. They had a summer home at Waukegan, and before the death of Sexton Miss Gleason was at the summer home with the young son. The night before Sexton's death she was requested to come to the family residence and bring the son, as Sexton would probably like to see him. She arrived on the morning of the next day, which was the day of Sexton's death. A servant in the family testified that after the death of Sexton Miss Gleason took the satchel from his room, put it under her apron and carried it into a room across the hall. Afterwards the witness went to the room to speak to Mrs. Sexton, and said she found her and Miss Gleason sitting on the side of the bed with the satchel open between them and papers scattered over the bed, and that they were examining papers. Mrs. Sexton testified that after the death of

her husband she requested Miss Gleason to take charge of the satchel and keep it safely until she could deliver it to Jacobs. Miss Gleason testified she took the satchel into the nursery, put it in a closet, locked the door, and it remained there until she took it out the next morning and delivered it to Jacobs. She and Mrs. Sexton both testified they did not have the satchel on the bed in a room, with papers scattered around it, and that they never opened the satchel. Both testified that when Miss Gleason came from Waukegan she brought an accumulation of mail that had been sent there, and some time during the afternoon they went into the spare bed-room and together looked over the mail. Both Mrs. Sexton and Miss Gleason emphatically denied opening the sealed package or ever having seen anything of any notes at any time. Jacobs testified that prior to the delivery of the package to Father Smyth by Sexton, before starting for Europe, Sexton brought a package to the office done up in rubbers and asked the witness to put a heavy paper around it and seal it. The witness testified he put heavy brown paper around it, sealed it up at both ends with black or dark sealing wax, and stamped it with an old seal he thought had been procured from some express company and had the name of the express company on it. He further testified that when the package was delivered to him on the morning after the death of Sexton it had no appearance of ever having been opened but appeared to be exactly in the same condition as when he first sealed it up. He testified he did not open it, but delivered it to Father Smyth just as he received it at Sexton's house. Father Smyth testified that when delivered to him by Jacobs after Sexton's death the package looked the same as when he first received it from Sexton before his departure for Europe; that he could not see any difference in its appearance at that time and when delivered to him by Jacobs.

There was other testimony more remotely bearing on the question but not of sufficient importance to justify re-

ferring to it in detail. If the testimony which we have tried to set out in substance, together with the surrounding circumstances, is too inconclusive to justify finding that the notes were destroyed after or about the time of the death of Sexton, the other evidence in the record is not of a character that would turn the scale in favor of the contention of the plaintiffs in error that the notes were destroyed by Mrs. Sexton, or by her and someone acting with her and at her direction.

Plaintiffs in error contend that Judge Kavanagh's testimony conclusively establishes the existence of the notes ten days before the testator's death, and that the usual presumption that the testator destroyed them himself after that time cannot obtain because of his physical condition, and because no circumstances were shown to have occurred that might have caused him to change his mind and revoke the bequests to plaintiffs in error. Judge Kavanagh testified his visit to the testator when he told him the notes were then in his possession was about ten days before the testator's death. Mrs. Sexton thought it was about three weeks before his death. The fact, alone, that the testator said he had the notes then in his possession does not establish that Mrs. Sexton destroyed them, nor is it sufficient, in connection with all the other testimony, to establish that fact.

Dr. Patrick, the attending physician, testified Sexton had a disease of the spinal cord and anæmia; that his condition varied a good deal but the general tendency was to become worse, and after he became quite weak he had spells of fainting and extreme prostration. His mental condition was good. During a part of his illness the doctor saw him every second day and a part of the time every day. Except when he had fainting spells he was conscious and capable of thinking clearly. The doctor last saw him on the day of or the day previous to his death,—he was not certain which. He said at that time there was nothing to indicate immediate death, although he had previously informed Mrs.

Sexton that he thought her husband could not possibly recover. Mrs. Sexton and Lawrence, the nurse, both testified that some time prior to Sexton's death there were other papers in the satchel than the sealed package and copy of the will; that Sexton frequently examined the papers and tore up and destroyed a good many. Neither she nor any one else claims to know what papers he had destroyed or whether they were notes.

The proof tends to show some unpleasant acts and conduct on the part of some of the relatives of Sexton during his illness, after his return from Europe. To what extent this may have affected him cannot be known, but in the light of the evidence we cannot say the assumption must be indulged that nothing occurred during that period which might have caused him to change his mind with reference to the provisions of his will. Independent of any notes, substantial provisions were made for the brother and sisters of the testator. He held his brother's note for $40,000, secured by mortgage; also the note of Mrs. Keeler and husband for $40,000. These were surrendered and the indebtedness canceled under the provisions of the will. Mrs. Reilly was given real estate valued at $5000 and Mrs. Mc-Anrow real estate valued at $9500.

Without further extending the discussion, already, perhaps, unnecessarily long, it is sufficient to say that the evidence does not sustain the contention of plaintiffs in error that the notes were in existence at the time of Patrick J. Sexton's death and were destroyed by Mrs. Sexton. This was the view of the Appellate Court, and, independent of its view upon other legal questions involved, its judgment was correct and is therefore affirmed.

*Judgment affirmed.*